The defendants were indicted for maintaining a public nuisance, produced by the creation of a milldam and the ponding of water thereby upon adjacent lands, etc.
There were two counts in the bill, but as the court directed the jury not to consider the second only the first is set out.
"The jurors for the State, upon their oath, present that John B. Holman and Elizabeth Holman, late of Iredell County, on 1 August, 1889, at and in the county aforesaid, did unlawfully, injuriously, (862) willfully, and knowingly maintain and keep a certain dam across Fifth Creek, in said county, upon land of the said John B. Holman and Elizabeth Holman, and within their control; by means of the dam aforesaid the water flowing into the creek aforesaid was stopped and damned up and flowed back in upon the surface of large tracts of adjoining lands, by means whereof the mud, wood, leaves, brush and other animal and vegetable substances and other filth, collected and brought down the channel of the said water course by the natural flowing of the waters, then became and were, during the time aforesaid, collected and accumulated in large quantities in the channel of the said water course and on the lands overflowed as aforesaid; and the said mud, wood, leaves, brush, animal and vegetable substance and other filth, so there collected in said water course and on the lowlands adjacent thereto, became and were and still are very offensive, and the water became and is corrupted, and by means whereof divers nauseous, unwholesome and deleterious smells and stenches did arise, so that the air was and still is corrupted, to the great damage and common nuisance of the good and worthy citizens of this State there passing and repassing, dwelling and inhabiting, contrary to the form of the statute in such case made and provided, and against the peace and dignity of the State."
It was in evidence that the defendants owned and operated a mill on Fifth Creek, in said county, and for the purpose of securing the motive power therefor maintained and kept a dam about nine feet high across the creek; the dam was erected about seventy-five years ago, and had not been raised since its erection. The land along and adjacent to the creek had been cleared for agricultural purposes; some twelve years *Page 595 
ago the owners of the land on the creek above the mill had cut a ditch, about a half-mile long, for the purpose of draining their land; after several efforts to keep it open it was found impossible to (863) do so, and it was abandoned about two years ago; a considerable quantity of timber on the low grounds above the pond had died and fallen into the water; the grass and other vegetation was in the same condition; large quantities of sand and mud had washed into the pond, causing the water to become stagnant for two miles above the mill; holes and "duck ponds" had been formed by the stagnant water and the sand which had washed in the channel of the creek and in the low lands adjacent thereto, and the land had become wet and "sobbed," causing the water to have a green scum over it and emitting unpleasant odors. It was also in evidence that within a radius of four miles up the creek and two miles on either side of it eighty-seven families lived; that there had during the past two years been intermittent fevers, caused by malaria.
Several physicians practicing in the section adjacent to the mill testified that there had been much sickness among the families living near the creek and mill, caused by malaria, giving the number of persons so affected; and they gave the opinion that the malaria which caused the sickness was produced by the stagnant water, sand, mud and decaying vegetation in and above the pond. Several of the physicians testified that malaria was found in high land as well as swamps. There was much diversity of opinion among the physicians as to the composition of malaria and the cause producing it.
It was in evidence that Dr. Hill, Superintendent of Health of Iredell County, had made an examination of the pond in January, 1889, and on 17 July, 1889, served notice upon the defendant to remove the dam, pursuant to the provision of the act of 1885.
There was in evidence of the fall per rod of the creek from the pond to the point about two and three-fourths miles above.
The defendants objected to any evidence as to the condition of the pond prior to 1 August, 1889, the day named in the indictment. (864) The objection was overruled, and the defendants excepted.
The defendants requested the court to charge the jury:
"1. To make the defendants' milldam and pond a public nuisance, and the defendants indictable for maintaining the same, it must injuriously affect the public, that is, it must affect the whole community. The fact that it injuriously affects individuals or families in a community is not sufficient to make defendants guilty. They should be acquitted unless the jury are satisfied the whole community is so injuriously affected — not every family or person in the community, but the community generally." The court gave this instruction. *Page 596 
"2. If the jury should find from the evidence that the community is so injuriously affected as to make the dam and pond a public nuisance, the defendants would not be guilty if the agencies over which the defendants had no control and no agency in producing entered into and contributed to the dam and pond in producing such injurious effects upon the community." The court declined to so instruct the jury, and defendants excepted.
* * * * * * *
"4. That although defendants' dam and pond may have contributed to produce such a state of facts as to cause a public nuisance, but other causes to which defendants did not contributed, and which did not arise from their agency, so affected the dam or pond, or either of them, as to produce such nuisance, then they are too remote to be ascribed to their acts, and the defendants would not be guilty." This instruction was not given, and defendants excepted.
"5. That if the evidence should satisfy the jury that the whole community had been injuriously affected, yet defendant would not be (865) guilty unless it was further found from the evidence that such injury was produced directly and proximately by defendants' dam and pond, and by no other cause." This instruction was given.
The court further instructed the jury as follows:
"The defendants are liable only for such results as flow directly, naturally and proximately from the pond and dam. Therefore, if you find that the pond and dam are the cause of the nuisance, you should convict the defendants; but if other causes or agencies to which the defendants have not contributed, and which did not arise from their agency, so affected the pond and dam as to produce the cause of the sickness, then such sickness would be attributed by law to such agencies, and not to the pond or dam, and you should acquit the defendants.
"The erection of the dam is not in itself wrongful, nor is the millpond in itself a nuisance; if, however, by reason of natural causes, such as decaying vegetation which has grown or been brought into the pond by the stream or its natural tributaries, or changes in the topography of the land adjacent to the creek from the operation of natural laws, the pond produces or contributes to the production of malaria or noxious, unhealthy odors, to that extent which injuries the health or comfort of the community in general, it would thereby become a nuisance and the defendants indictable for maintaining it.
"If, however, other persons not under the control of the defendants plow or bring into the pond or the lands adjacent thereto substances which decay and produce malaria; or if such persons cut ditches into the stream above the pond, thereby bringing sand and mud into the creek, or if having cut such ditches failed to keep them open, permitting them *Page 597 
to become choked and filled up, thereby causing malaria, such result would be attributed to such persons and agencies and not to the pond, and defendants should be acquitted.
"The defendants insist, further, that the dam is not the cause of the accumulation of the sand and mud in the creek and the (866) water in the low grounds, because the creek has not sufficient fall to convey away of its own force the sands which from natural causes and the cultivation of the land come into it. In respect to this phrase of the case, if you find from the testimony that the stagnant water, sand and mud, which produce the malaria, is caused by the natural formation of the bed of the creek and not by the dam, nor contributed to by the dam, the malaria and sickness consequent thereupon would be attributed to such natural formation and not to the dam.
"But if the dam either directly causes or increases the inundation of the sand, mud and stagnant water which produces the malaria, or the water would, if unobstructed, carry off the sand, and the dam so obstructs as to prevent its doing so, the defendants would be guilty. The law will not undertake to apportion the liability for a public wrong. The question for the jury to decide, applying principles of law, is `Does the dam and pond produce the nuisance?' If so, defendants are guilty; otherwise, they should be acquitted.
There was a verdict of guilty, and from the judgment thereon the defendants appealed.
The defendants except because three of their prayers for instructions were not given. We think the charge given, while in many respects substantially the same, is more accurate and correct. S. v.Rankin, 3 S.C. 438. If the dam and pond, without the contribution to the pond from sources over which defendants had no control, and for which they are not responsible, would not be a nuisance, the defendants were not guilty. If, however, the dam and pond per se created a nuisance, the fact that such nuisance was made still greater by acts (867) which defendants could not control would not entitle them to an acquittal. The jury were properly directed that unless the dam and pond were the direct and proximate cause, i. e., the causa causans of the nuisance, the defendant should be acquitted. The language of the judge is to be read with reference to the evidence and the points disputed on the trial, and of course construed with the context. S. v. Tilley, 25 N.C. 424. Upon examination of the entire charge it is a fair and clear statement *Page 598 
of the law arising upon the evidence, and we do not see that the jury were misled in any way to the prejudice of the defendants.
Nor was it error to refuse to exclude evidence tending to show the existence of a nuisance prior to the date laid in the bill. The date is not of the essence of the offense in this case, and the State was entitled to show the existence of the nuisance at any time within two years before the beginning of these proceedings.
In fact, however, the bill charges that the acts complained of "became, were and still are" a nuisance to the public, importing a prior and a continuing offense. The same words also dispose of the motion in arrest of judgment, which was made upon the ground that no continuando is charged. It was sufficiently set out and it was no error to allow proof of it. The bill is a copy of approved precedents. Wharton Criminal Forms and Precedents, 701.
While long possession may confer a right to land flowed, and all the proprietary incidents which follow the title to property, it cannot be set up as a bar to the abatement of a nuisance on behalf of the public. A right to violate the law is not to be presumed from any lapse of time however great. Chitty Crim. Law, 160, 16 Am. Rep., 737. Indeed, an acquiesence [acquiescence] for seventy years has been held no bar to criminal proceedings against a nuisance.
Affirmed.
Cited: S. v. Wolf, 112 N.C. 893; Cline v. Barker, 118 N.C. 782; S.v. Poyner, 134 N.C. 611; S. v. Lilliston, 141 N.C. 861; Shelby v. PowerCo., 155 N.C. 201.
(868)